91
Rev: 11/97

CRIMINAL COMPLAINT

ORIGINAL

LODGED

UNITED STATES DISTRICT COURT     CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA     2010 JAN 26 PM 3:18
v.

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

SALVADOR OROZCO HERNANDEZ, JR., ROBVERT ZAVALA CARRILLO,
CHRISTOPHER NEVAREZ, RONNIE MARQUEZ, IGNACIO CHAVEZ,
ANDREW PACHECO MORENO, DANIEL HENRY PADRON, MARK GIL,
JOSE ARREDONDO, JOHNNY GOMEZ, VENESSA GARCIA, ALLEXXI
OLONNA SMITH, CHRIS JAMES GARCIA, RUDY TOVAR, NATENO
MORENO, PAUL CORTEZ, ALLAN STALEY, and DEANNA WAGNER

MAGISTRATE'S CASE NO.

ED 10 - 00025 M

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 6 2010

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

Complaint for violation of Title 21, United States Code, Section 846.

| NAME OF MAGISTRATE JUDGE | UNITED STATES | LOCATION |
|---|---|---|
| HONORABLE DAVID T. BRISTOW | MAGISTRATE JUDGE | Riverside, CA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| Beginning on an unknown date continuing to September 2009 | Riverside County | |

COMPLAINT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on an unknown date and continuing without interruption to on or about September 2009, in Riverside County, within the Central District of California, and elsewhere, **SALVADOR OROZCO HERNANDEZ, JR., ROBVERT ZAVALA CARRILLO, CHRISTOPHER NEVAREZ, RONNIE MARQUEZ, IGNACIO CHAVEZ, ANDREW PACHECO MORENO, DANIEL HENRY PADRON, MARK GIL, JOSE ARREDONDO, JOHNNY GOMEZ, VENESSA GARCIA, ALLEXXIS OLONNA SMITH, CHRIS JAMES GARCIA, RUDY TOVAR, NATENO MORENO, PAUL CORTEZ, ALLAN STALEY, and DEANNA WAGNER** violated Title 21, United States code, Section 846, (Conspiracy to possess with intent to distribute and to distribute more than 50 grams of actual methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
    (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT JASON T. GHETIAN |
|---|---|
| | OFFICIAL TITLE SPECIAL AGENT- Federal Bureau of Investigation (FBI) |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE January 26, 2010 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
ANTOINE RAPHAEL:re

AFR

**AFFIDAVIT**

I, Jason T. Ghetian, being duly sworn, declare as follows:

**I.**

**INTRODUCTION**

1.    I am an investigative or law enforcement officer of the
United States within the meaning of 18 U.S.C. § 2510(7), who is
empowered by law to conduct investigations of, and to make
arrests for, offenses enumerated in 18 U.S.C. § 2516.  I am a
Special Agent ("SA") with the Federal Bureau of Investigation
("FBI"), and have been so employed since November 2003.  Since
October 2009, I have been assigned to the Santa Ana Resident
Agency, Los Angeles Field Office.  Previous to this assignment, I
was co-located with the Drug Enforcement Administration ("DEA"),
Riverside Office, for approximately two years.  During my
employment with the FBI, I have participated in numerous
narcotics and gang investigations as both a case agent and in a
supportive role.  I have received formal training and spoken to
informants, DEA agents, and other FBI agents concerning the
methods and means of violent Hispanic gangs.  I have received
approximately 17 weeks of training at the FBI Academy in
Quantico, Virginia.  In addition, I have conducted investigations
of individuals involved in the distribution, possession,
manufacture, and importation of controlled substances, including
methamphetamine, as well as investigations involving individuals

1

who have illegally possessed firearms.  As an FBI Agent, I primarily investigate violent gangs, large scale narcotics traffickers, and money laundering organizations.

2.  I have specialized training and experience in the investigation of narcotics trafficking and gangs.  I have participated in gang narcotics investigations as a case agent and in a subsidiary role.  I have also participated in the debriefing of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations and criminal street gangs.  Additionally, I have participated in many aspects of drug and gang investigations, including conducting surveillance and conducting court-ordered interceptions of wire communications.  I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering.  I am aware that drug traffickers and gang members often communicate with their drug-trafficking and gang associates through the use of cellular telephones and digital display paging devices.  I am also familiar with the manner in which criminal street gangs distribute narcotics in areas they control.

///

2

## II.

## PURPOSE OF AFFIDAVIT

3.   I make this affidavit in support of a complaint and arrest warrants for the following target subjects:  SALVADOR OROZCO HERNANDEZ, JR., aka "Toro," aka "Tio," ("SALVADOR HERNANDEZ," or "HERNANDEZ"); ROBERT ZAVALA CARRILLO, aka "Pato," aka "Duck,"("ROBERT CARRILLO" or "CARRILLO"); CHRISTOPHER NEVAREZ, aka "Flako," ("NEVAREZ"); RONNIE MARQUEZ, aka "Shadow," ("MARQUEZ"); IGNACIO CHAVEZ, aka "Kartune," ("CHAVEZ"); ANDREW PACHECO MORENO, aka "Drew," ("ANDREW MORENO"); DANIEL HENRY PADRON, aka "Danny Boy," aka "Sneaky," aka "Sneaks," ("PADRON"); MARK GIL, aka "Papa," aka "Little G"; JOSE ARREDONDO, aka "Tony," ("ARREDONDO"); JOHNNY GOMEZ, aka "Johnny," ("GOMEZ"); VANESSA GARCIA, aka "Pookie," aka "Erica"; ALLEXXIS OLONNA SMITH ("SMITH");  CHRIS JAMES GARCIA, aka "Chuco," ("CHRIS GARCIA"); RUDY TOVAR, aka "Dinky," ("TOVAR"); NATENO MORENO, aka "Shorty"; PAUL CORTEZ, aka "Wiskers," ("CORTEZ"); ALLAN STALEY, aka "Paya," aka "Payan," ("STALEY"); and DEANNA WAGNER ("WAGNER"), for violation of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute more than 50 grams of actual methamphetamine, a schedule II controlled substance, in violation of Title 21,

3

United States Code, Sections 841(a)(1) and (b)(1)(A)).[1]

### III.

### <u>BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT</u>

4.   This affidavit is based on personal knowledge I gained from my participation in this investigation as well as information from the following sources:

a.   Oral and written reports about this and other investigations, which I have received from other federal agents and other law enforcement agencies;

b.   Physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly;

c.   Debriefings of a confidential source; and

d.   Intercepted wire communications.

5.   One of the law enforcement agents who worked with me on this investigation and provided me with written and oral reports is Detective Joseph Miera of the Riverside Police Department. The following is a summary of Detective Miera's training and

---

[1]   Of the eighteen target subjects listed above, the following nine individuals are currently in state or local custody:  HERNANDEZ (conviction for attempted murder); NEVAREZ (parole violation); MARQUEZ (awaiting trial on drug trafficking and weapons charges); CHAVEZ (awaiting trial on attempted murder and drug trafficking); PADRON (conviction for drug trafficking); ARREDONDO (conviction for drug trafficking); VANESSA GARCIA (parole violation after being found in possession of a firearm); SMITH (conviction for carjacking), and TOVAR (conviction for drug trafficking).

experience:

a.   Detective Miera is employed as a police officer in
the City of Riverside and has been so employed since June 21,
1991.  Detective Miera is currently working as a detective
assigned to the Special Investigations Bureau, specifically Gang
Intelligence/ Narcotics.  Detective Miera has been assigned to
the Gang Unit since November 27, 2001.  Prior to that time, he
was assigned to the Gang Unit from August 1994 to August 1996.
Prior to that assignment, Detective Miera was assigned to the
Patrol Division where he had a chance to work both patrol and
bike detail.  During that time, Detective Miera talked to several
gang members about various types of crimes.  These gang members
spoke to Detective Miera freely about their respective gangs'
modes of operation, structure, dress, graffiti, and signs.
Detective Miera has received several hours of training from
senior gang officers of the Riverside Police Department and has
been involved in several investigations including robbery,
murder, and sales of controlled substances.

b.   Detective Miera graduated from the Riverside
Sheriff's Academy on June 21, 1991.  He currently possesses an
Intermediate P.O.S.T. certificate.  While in the academy,
Detective Miera received the P.O.S.T. required training on gangs
and is also a member of both the California Narcotics Officers
Association and the California Gang Investigators Association.

5

While attending some of the association meetings, Detective Miera received training on how street gangs operate with respect to narcotics trafficking.  Detective Miera also learned about various other aspects of street gangs, such as their modes of operation, structure, dress, graffiti, and signs.  In April 1993, Detective Miera completed a twenty-four-hour seminar on drug influence sponsored by the Orange County Sheriff's Department. During this seminar, Detective Miera received eight hours of training on street gangs, which included structure, operation, dress, and their involvement in selling drugs.  In October 1994, Detective Miera completed a twenty-four-hour gang awareness seminar sponsored by the San Bernardino Sheriff's Department. During the seminar, Detective Miera learned about street gangs' modes of operation, structure, dress, graffiti, signs, etc. In February 1995, Detective Miera attended a fifteen-hour seminar sponsored by the National Law Enforcement Institute held in Huntington Beach, California.  During the seminar, Detective Miera learned about all aspects of gangs, including the structure of the street gangs, mode of operation, graffiti, hand sings, tattoos, and dress.  On June 15, 1995, Detective Miera attended a four-hour gang workshop presented by the Riverside County District Attorney's Office.  During the workshop, Detective Miera received training on proper gang identification, documentation, and interview techniques.  In August 1995, Detective Miera

attended a conference represented by the California Gang Investigators Association where he learned about the structure of street gangs and how they operate.

     c.  While assigned to the Gang Unit, Detective Miera personally investigated and assisted in the investigations of various gang-related crimes ranging from narcotics, robbery, drive-by shootings, and murder. Detective Miera also attended different Neighborhood Watch meetings and Patrol briefings where he lectured on gangs in Riverside County.

     d.  Detective Miera was involved in different multi-agency operations involving the execution of search warrants and the apprehension of identified gang members. This included different crush operations and warrants related to various crimes.

     e.  From April to June of 1994, Detective Miera was directly involved in Operation R.A.G.E. (Rid Arlanza's Gang Element). During that period, Detective Miera was able to contact several gang members who frequented the area of Arlanza. This includes local gang members and members from outside the city (i.e. Orange County and Los Angeles). Detective Miera was able to learn about the structure, operation, graffiti, dress, and hand signs.

     f.  From the period of August 1994 to August 1996, Detective Miera was involved in several undercover narcotics buy

7

programs targeting numerous criminal street gangs engaged in narcotics sales in the city of Riverside, California. During these undercover narcotics buy programs, Detective Miera was able to learn how local gang members operate while conducting sales of illegal narcotics. On September 19, 1996, Detective Miera received in-house gang training in regards to outlaw motorcycle gangs where he learned about their various modes of operation, structure, dress, etc. On March 3, 1998, Detective Miera attended an eight-hour gang awareness update at the San Bernardino County Sheriff's Department where he received training on how street gangs operate in respect to their involvement in various crimes.

g.   In August 1995, Detective Miera was involved in an undercover buy program (Operation S.A.G.G.I.N.), where street level narcotics dealers and gang members were targeted. During this operation, Detective Miera was able to learn how gang members operated while conducting sales of illegal narcotics. In the month of August 2001, Detective Miera participated in a special task force designated to target the eastside area of Riverside. This task force was involved to monitoring on-going tensions between various Hispanic and Black gangs on the east side. During the existence of the aforementioned Task Force, which lasted approximately six weeks, Detective Miera was able to contact several gang members and speak to them about their modes

8

of operation, structure, dress, graffiti, and signs.   During this operation, Detective Miera was directly involved in the investigation of several gang-related crimes throughout the eastside area of Riverside which included drive-by shootings and beatings related to the racial tension in that area of Riverside. In October 2001, Detective Miera participated in another gang Task Force designed to concentrate on the Casa Blanca area of Riverside due to increased gang violence in the neighborhood. During the operation, Detective Miera again had an opportunity to speak to several gang members about their modes of operation, structure, dress, graffiti, signs, etc.   Detective Miera was also directly involved in several gang related crimes that occurred during that period.

h.   In July 2002, July 2003, and July 2005, Detective Miera attended yearly conferences presented by the California Gang Investigators Association in Anaheim, California, where he received forty hours of formal lecture in regards to the structure of various street gangs and how they operate. Detective Miera is also a current member of the California Gang Investigators Association.

i.   In November 2007, Detective Miera attended a yearly conference presented by the Riverside County Gang Investigators Association in Riverside, California, where he received forty hours of formal lecture in regards to the

9

structure of various street gangs and how they operate. Detective Miera is a current member of the Riverside County Gang Investigators Association.

j.   In addition to the above mentioned training, Detective Miera has received on-the-job training in the manner in which gangs conduct themselves and their attempt to hold certain territories in controlled geographical areas within the City of Riverside.  Detective Miera has spoken to other gang investigators, officers, and informants regarding the manner in which Black and Hispanic street gangs create fear, commit property crimes, and acts of violence against innocent members of the public and other rival gangs and their members.  He has followed the evolution of rivalries and disputes between competing gangs and gang members and associated acts of violence carried in furtherance of such robberies and disputes.  Detective Miera has also testified as an expert on criminal street gangs in Riverside Superior Court.

6.   Unless otherwise noted, when I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement or the statement was reported to me by another law enforcement officer, either directly or in a written report.  The officer providing me with the information may have received the information by way of personal knowledge or from another source.  Because this affidavit is being submitted

10

for the limited purpose of seeking a complaint and arrest warrants, I have not set forth every fact known to me about this investigation.

**IV.**

**PROBABLE CAUSE**

A.   **Investigation Background**

7.   From approximately November 2008 through January 2010, federal, state, and local law enforcement agents, including myself, have conducted an investigation into the drug trafficking and racketeering activities of the Eastside Riva Gang ("ESR"), a criminal street gang operating in the City of Riverside, California. The federal, state, and local law enforcement agencies involved in this investigation include: The United States Attorney's Office, the Riverside District Attorney's Office, the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), the Riverside Police Department ("RPD"), and the California Department of Corrections ("CDC").

8.   As part of this investigation, law enforcement agents, pursuant to court orders authorizing and approving the interception of wire communications, intercepted a series of telephones that were used by members and associates of ESR. These interceptions enabled law enforcement to identify individuals involved in drug trafficking activities. Law enforcement agents also obtained

11

copies of prison correspondence and recorded telephone calls from local jails.

9.    In this affidavit, I have referred to intercepted conversations in which the identified participants used coded and vague language to describe their illegal activities.  I have set forth my interpretations of these conversations, which are based upon my training and experience, investigation in this and other cases, and my discussions with other gang and drug investigators.

**B.    The Eastside Riva Gang**

10.    ESR is a criminal street gang with a membership of over 500 members that was formed in or about the late 1980s and claims as its "territory" or "turf" the geographical area consisting of the eastside of the City of Riverside, California, including east of the 91 Freeway to the city limits, north to the city limits, and south to Central Avenue.  ESR members and associates use the symbol "ESR" in both their writings and tattoos.

11.    ESR contains numerous small groups, also known as cliques, which include Los Primos, Paterson Park, 14th Street, Park Avenue, Los Traviesos, Defiantes, Deliquentes, Romanos, and Tiny Dukes.  Clique Los Primos ("ESR-LP") also claims the area around Park Avenue and 13th Street as its turf.

12.    ESR is a turf-oriented gang that relies on the possession of firearms to defend and maintain its turf.  Possession of firearms allows members of ESR to attack or defend themselves

12

from rival gang members and to protect their turf from others who may try to sell controlled substances in ESR territory without paying "taxes" or "rent" to ESR.  Gangs and individual gang members earn their reputation and respect within the gang culture as a result of their violent tendencies.  In other words, the most violent gangs are the most respected.  The violent propensity of the gang instills fear in the community and creates an atmosphere where victims and witnesses will be reluctant to testify against gang members out of fear of retaliation.  The possession of firearms assists the gang members in getting respect by rival gang members and instilling fear in the community.

### C.   **Background and Rules of ESR**

13.  ESR is nearly exclusively comprised, and recruits from a base, of Hispanic males.  ESR members and associates typically range in age from 11 to older than 40.  ESR has a hierarchy whereby older members, members who have committed serious offenses, and members involved in narcotics trafficking may direct or control many of the activities of younger members and associates.  These older members are often referred to as "OG's," "veteranos," or "shot callers."  ESR activities do not, however, always result from directions given by older members.  Instead, some ESR activities result from ESR members' compliance with ESR rules that include, but are not limited to, ensuring the protection and expansion of ESR territory by attacking individuals whom ESR members and

13

associates believe are not, for whatever reason, allied with the ESR, or who are simply perceived at the moment as an opportunity victim, i.e., a victim against whom a criminal offense may be committed in order to promote or maintain the power or stature of an ESR member.

14.   There are a variety of ways of joining the ESR.   One can be "crimed in," "jumped in," or "walked in."   A member is "crimed in" if he or she commits a crime – which can be as simple as stealing beer from a convenience store or as heinous as committing murder – on behalf of the gang.   A member is "jumped in" if he or she initiates fights with one or more rival gang members and survives.   A member is "walked in" if he or she gains membership through family ties or through friends in the gang.

15.   ESR activities that also result from ESR members' compliance with ESR rules include, among other things, "cruising" to rival gang territory to attack rival gang members.   "Cruising" is a frequent ESR activity whereby ESR members arm themselves with an array of deadly weapons, including knives, baseball bats, and pipes, and drive in groups to rival gang territory to attack rival gangsters.

16.   ESR rules demand that ESR members be vigilant to the presence of individuals whom such members believe are not known to be members or associates of the gang.   ESR rules require that ESR members attack individuals who may intentionally or inadvertently

14

attempt to enter territory controlled by the ESR, including individuals who may enter ESR territory to shop in stores or restaurants claimed as ESR turf, or who may simply be traveling through ESR-claimed territory. ESR members who carry out such attacks maintain and promote their roles within the ESR, and ESR member prospects gain acceptance and power within the ESR by carrying out such attacks early in their tenure as ESR members.

17.   ESR members frequently question their targets just prior to attacking them by posing a rhetorical question to feign interest in the intended victim, such as "where [are] you from?" as if to inquire of the potential victim's gang affiliation, whether or not the ESR interrogator has knowledge of the victim's gang affiliation, if any.   ESR is hostile to the presence of African-Americans in ESR territory, regardless of whether such individuals are affiliated with a gang.   As part of ESR rules, ESR members frequent certain locations that ESR claims as its territory, including privately owned businesses and public recreation facilities frequented by non-gang affiliated customers and members of the general public.   ESR members' roles within the ESR are promoted and maintained where ESR members harass or attack non-gang affiliated individuals who use these businesses or facilities.

18.   ESR members generally identify one another through unique monikers and through the use of common hand gestures or gang "signs."   Thus, using their hands, ESR members typically "throw" or

15

display the letters, such as, "E", "S", and "R" (for ESR) or "T", "D", "K" and "S" (for the clique ESR "Tiny Dukes"). Members frequently wear shirts printed with the word "Riva" or similar ESR-related verbiage. Gang tattoos, gang names, and slogans are also used to identify members and territory controlled by the gang. The ESR also uses spray-painting, or "tagging," to demonstrate ESR control of an area against rival gang members and the local community or to harass rival gang members when such tagging is done on rival gang turf. Gang tagging frequently appears on street signs, walls, and buildings, both public and private, and on private residences in the areas controlled by the gang as well as in rival gang territory. Rival gang members risk personal attack from the gang if they attempt to "tag" within ESR-controlled territory. ESR members and associates display and demonstrate their loyalty to the ESR by posting pictures of themselves showing ESR tattoos, logos, hand signs, and codes. ESR members communicate about ESR business by using the Internet social networking service "MySpace." ESR members and associates also demonstrate their loyalty to the ESR and deliver its messages of violence and intimidation to rival gangs and to law enforcement authorities in rap music videos and recordings containing vivid lyrics regarding gang crimes.

19. ESR members are frequently armed with sharpened

16

screwdrivers. ESR members also maintain a ready supply of butcher and kitchen knives, baseball bats, and pipes, and have access to firearms, in order to enforce the authority of the ESR gang and to protect its turf. ESR firearms typically are stolen or unregistered, so that the use of the weapons cannot be readily connected to the gang member who either used the weapon or maintained it.

20. ESR members also ascribe to a general understanding that respect within the gang may come from committing criminal acts even if such acts are not directed by senior members. Thus, for example, an ESR member may rise in gang stature and power by voluntarily committing criminal acts, including criminal acts that are not directed toward rival gangs, so long as such acts do not bring unnecessary scrutiny by law enforcement.

21. Although ESR does not generally permit females to become members, female associates, sometimes referred to as "hynas," exist and support ESR activities by facilitating or providing sanctuary for ESR members to meet to discuss ESR business, by driving ESR members to "cruise" in search of rival gang victims, by transporting or selling drugs on behalf of the ESR, and by collecting drug proceeds on behalf of ESR. Female associates may also participate in communicating ESR business between ESR members, including facilitating "three-way" communications via telephone or mail between an incarcerated ESR member and other ESR members.

22.   ESR controls the activities of its members and enforces its authority and internal discipline by assaulting and threatening its own members or others who might present a threat to the gang.

23.   ESR members also frequently intimidate, threaten, and assault persons in the area as a means to intimidate and control the people in their neighborhoods, including potential witnesses who would testify in court about crimes committed by ESR members and associates.   These ESR crimes typically range from personal attacks, including hate crimes against African-Americans, to attacks against property.

**D.   ESR'S Connections to the Mexican Mafia**

24.   The Mexican Mafia, also known as "La Eme" or "Eme," is the most powerful Hispanic gang within the California prison system and exerts control over the activities of Hispanic street gangs in Southern California conducted outside the prison system through its ability to order the assault or murder of members of those street gangs who are incarcerated.   "Eme" is the Spanish word for the letter "M" in the alphabet.   The number "13" is used to symbolize La Eme because "M" is the thirteenth letter in the English alphabet.   Members of the Mexican Mafia come from the ranks of local Hispanic street gangs.

25.   Members and associates of ESR also pay a tribute, referred to as "taxes" or "rent," to members and associates of the Mexican Mafia in order to maintain control over ESR's territory,

18

and in order to assure protection for ESR members once they enter California state or federal penal institutions.  The Mexican Mafia exerts control over Southern California Hispanic street gangs by placing a "green light" on any Southern California Hispanic street gang that fails to pay drug "taxes" to the Mexican Mafia or otherwise follow the Mexican Mafia's instructions.  Once a green light is placed on a particular gang, all other Southern California Hispanic street gangs are authorized to assault and murder members of the gang receiving the green light.  By paying drug "taxes" to and otherwise following the dictates of the Mexican Mafia, Southern California Hispanic street gangs such as ESR avoid receiving a green light, which ensures the protection of ESR members who are incarcerated.

26.  Mexican Mafia members, called "carnales" or "brothers," typically divide the territory of Southern California Hispanic street gangs between them.  At any given time, one or more members of the Mexican Mafia has control over ESR's territory and is empowered to receive the drug "taxes" from ESR and to issue orders and instructions to ESR.  A Mexican Mafia member with authority over ESR's territory typically enlists the assistance of an ESR member and authorizes that ESR member to act in the name of the Mexican Mafia member.  Such authorization by the Mexican Mafia member is known as "giving the keys" to the ESR member.  An ESR member who has received the "keys" from a Mexican Mafia member is

19

empowered to collect drug "taxes" for that Mexican Mafia member from ESR members and drug traffickers selling drugs in ESR territory, resolve disputes among ESR members, issue orders to ESR members, and order assaults and murders.

27. ESR is loyal and subservient to the Mexican Mafia. ESR members, oftentimes in prison where they have access to contact with incarcerated members of the Eme, directed ESR members on the outside to comply with Eme directives at the risk of retribution.

**E.   Purposes of ESR**

28. The purposes of ESR, including its cliques, include, but are not limited to, the following:

a.   Maintain the control and authority of ESR over ESR territory or turf;

b.   Preserve, protect, and expand the power of ESR through the use of violence, intimidation, narcotics distribution, and threats of violence and intimidation; and

c.   Promote and enhance the individual authority of ESR members and associates.

**F.   Roles of the Target Subjects**

29. The investigation in this case revealed the following concerning the roles of the target subjects:

a.   As a validated Mexican Mafia member, SALVADOR HERNANDEZ issues directives to senior ESR members and appoints "tax collectors" to collect money derived from ESR's criminal

20

activities, including drug distribution in ESR territory.  SALVADOR HERNANDEZ is presently serving a prison sentence in California State prison for attempted murder.

b.    ROBERT CARRILLO, CHRISTOPHER NEVAREZ, and ANDREW MORENO are shot-callers.  ROBERT CARRILLO is the president of ESR Tiny Dukes clique and is the de-facto president of ESR.  NEVAREZ was responsible for interfacing with the Eme and communicating orders from the Eme to other ESR members.

c.    MARQUEZ, CHAVEZ, and MARK GIL are senior members of ESR.  Their authority is to be respected by other ESR members. These members police ESR activities and direct and advise other ESR members about the consequences of ESR actions and that conduct adverse to ESR would be met with sanctions.

d.    PADRON, ARREDONDO, GOMEZ, NATENO MORENO, VANESSA GARCIA, SMITH, CHRIS GARCIA, TOVAR, CORTEZ, and STALEY were involved in narcotics distribution and also supplied narcotics to members and associates of ESR.  Some of these individuals would also commit violent and property crimes to further the goals of ESR.  WAGNER assisted STALEY in his methamphetamine distribution business.

## G.    Confidential Source No. 1:

30.    Between July 2009 and January 2010, I spoke with a FBI confidential source who is a former ESR member ("CS1").  CS1 began cooperating with law enforcement in July 2009.  CS1 has a criminal

21

history, which includes two felony burglary convictions, a felony for receiving stolen property, and a drug felony. Based on my debriefing of CS1, I have learned the following: CS1 was jumped into ESR when he was twelve-years-old. As a gang member, he was required to rob people and beat people up to show that he had the guts to be a part of the gang. In addition, CS1 was expected to sell methamphetamine and give the profits to the president of ESR, CARRILLO, who then passed a portion of the profits on to the Mexican Mafia. CS1 explained that ESR members and associates who sell drugs (like methamphetamine) are required to give a portion of the drug proceeds to the leadership of ESR, including to CARRILLO. Additionally, even non-ESR members who sell drugs in ESR territory are required to pay taxes to ESR. CS1 stated that he was present on numerous occasions when Carrillo ordered individuals to be murdered.

31. I also learned the following from CS1: On June 26, 2009, an ESR member identified to me by CS1 arrived at CS1's location and ordered CS1 into his car, saying that "Mike" (referring to a shot-caller associated with ESR who is known to CS1 and to me) wanted to talk to CS1. CS1 was then taken to a residence located in Riverside (and identified to me by CS1). When he arrived, CS1 noticed CARRILLO along with thirty to forty other ESR members (including NEVAREZ) in the backyard of the residence, some of whom were armed with handguns. CS1 noticed that CARRILLO was also armed

22

with a handgun.  When CARRILLO saw CS1, he (CARRILLO) ordered the
other ESR members to kill CS1.  CS1 ran from the location.  NEVAREZ
chased after CS1.  NEVAREZ located CS1 in the area of 13th Street
and opened fire on him with a handgun (NEVAREZ was in a vehicle).
CS1 was not injured.  However, on July 3, 2009, CS1 was jumped by
three ESR members at a residence in Riverside (CS1 provided law
enforcement with the address of the residence).  The three male
attackers proceeded to beat CS1 with a baseball bat then fled the
scene after neighbors heard the commotion and arrived at the
location.

    32.  On January 22, 2010, I reviewed an RPD police report and
later spoke with Detective Miera and learned the following:

         a.   On July 16, 2009, Detective Miera interviewed a
local resident ("witness 1") who lives on 13th Street in Riverside.
Witness 1 provided the following information: On June 26, 2009,
witness 1 saw an unknown Hispanic male being chased by two male
individuals driving a small gray or brown vehicle.  Witness 1 then
heard three gun shots.  Witness 1 directed Detective Miera to a
hole in the doorway and said one of the shots made the hole.
Detective Miera then obtained a 9-mm round from the doorway.

         b.   Detective Miera interviewed a second witness
("witness 2") on July 3, 2009, who confirmed that witness 2 heard
a commotion coming from 2946 6th Street earlier that day so witness
2 exited the apartment to see what was going on.  Witness 2

                                23

observed three unknown Hispanic males coming down the staircase, one of which was holding a black baseball bat.

**H.    Acts By the Target Subjects In Furtherance of the Conspiracy**

33.    Based on my knowledge of this investigation, I know that the target subjects engaged in the following conduct to further the conspiracy to possess with intent to distribute and to distribute methamphetamine:[2]

**1. SALVADOR HERNANDEZ**

(1)    On or about February 5, 2009, using coded language in a letter to SALVADOR HERNANDEZ, CHRISTOPHER NEVAREZ discussed giving money obtained from ESR criminal activities to HERNANDEZ's wife so that she could put the money on HERNANDEZ's prison account, as well as the work that he (NEVAREZ) and ROBERT CARRILLO were doing on behalf of HERNANDEZ in Riverside.

(2)    On or about February 19, 2009, NEVAREZ discussed with another individual the collection of tax money from a business on behalf of SALVADOR HERNANDEZ.

(3)    On or about February 28, 2009, using coded language in a letter to SALVADOR HERNANDEZ, a co-conspirator ("co-conspirator A") discussed Mexican Mafia activities within the community and that he

---

[2] For clarity, I have listed the acts under the name of each target subject. To the extent a particular act was engaged in by more than one target subject, I listed that same act under the heading of each target subject who was involved.

24

was informed by CHRISTOPHER NEVAREZ that he (co-conspirator A) was not authorized to work on behalf of HERNANDEZ in Riverside.

(4)  In or about March 2009, using coded language in a letter to co-conspirator A, SALVADOR HERNANDEZ told co-conspirator A that he (co-conspirator A) had done nothing wrong to be targeted for assault and that co-conspirator A should have remained in his geographical location and worked there on behalf of Hernandez.

(5)  On or about April 3, 2009, using coded language in a letter to a co-conspirator ("co-conspirator B"), SALVADOR HERNANDEZ told co-conspirator B that CHRISTOPHER NEVAREZ was working on behalf of SALVADOR HERNANDEZ and that those gang members loyal to co-conspirator B should leave NEVAREZ alone.

(6)  On or about April 7, 2009, using coded language in a letter to CHRISTOPHER NEVAREZ, SALVADOR HERNANDEZ stated that he (HERNANDEZ) is glad that NEVAREZ is in the community providing HERNANDEZ's wife with the proceeds from drug sales, that he (HERNANDEZ) is aware that NEVAREZ had problems with other gang members who questioned NEVAREZ's EME association, and that he (HERNANDEZ) wrote a letter to the individual who was giving NEVAREZ problems expressing his (HERNANDEZ's) displeasure with that.

(7)  On or about April 13, 2009, using coded language in a

letter, SALVADOR HERNANDEZ instructed a co-conspirator ("co-conspirator C"), who is HERNANDEZ's wife, to inform him if she received money because he had people send her money.

(8) On or about July 14, 2009, VANESSA GARCIA possessed drug pay/owe sheets and notes with the name of SALVADOR HERNANDEZ, and a photo album containing photographs of ESR gang members, including ROBERT CARRILLO, and CHRISTOPHER NEVAREZ.

## 2. ROBERT CARRILLO

(1)  On or about June 20, 1992, ROBERT CARRILLO possessed a Kresge 12-gauge sawed-off shotgun and a Stevens 12-gauge sawed-off shotgun.

(2)  On or about January 1, 1994, ROBERT CARRILLO possessed a loaded firearm while leading police on a high-speed pursuit.

(3)  On or about March 24, 1994,  ROBERT CARRILLO possessed two .22 caliber rifles with sawed-off stocks and items containing ESR graffiti and the moniker "Pato."

(4)  On or about March 1, 2000, ROBERT CARRILLO admitted to an officer with the Riverside Police Department that he was a member of ESR, Tiny Dukes Clique, and that he used the moniker of "Pato."

(5)  On or about July 14, 2000, an ESR member who used the moniker "Twinkie" possessed a .44 caliber revolver while in the company of ROBERT CARRILLO.

(6)  On or about July 17, 2002, ROBERT CARRILLO admitted membership in the Tiny Dukes clique of ESR with the moniker "Pato."

(7)  On or about July 24, 2002, SAMUEL AGUIRRE and another ESR member attacked and stabbed C.Y. at the direction of ROBERT CARRILLO.

(8)  On or about July 26, 2002, ROBERT CARRILLO admitted to an officer with the Riverside Police Department that he was a member of ESR's Tiny Dukes clique with the moniker "Pato."

(9)  On or about February 5, 2009, using coded language in a letter to SALVADOR OROZCO HERNANDEZ, JR., CHRISTOPHER NEVAREZ discussed giving money obtained from criminal activities to HERNANDEZ's wife so that she could put the money on HERNANDEZ's prison account, as well as the work that he (NEVAREZ) and ROBERT CARRILLO were doing on behalf of HERNANDEZ in Riverside.

(10)  On or about February 10, 2009, at approximately 12:23 p.m., during a telephone conversation, JOHNNY GOMEZ discussed with RONNIE MARQUEZ the payment and collection of drug proceeds. Referring to CARRILLO by his moniker "Pato," GOMEZ told MARQUEZ: "I paid a thousand dollars to 'Pato' for the $2,200 you owed." GOMEZ went on to tell MARQUEZ: "Pato asked where the dope was at because you did not get caught with dope."  MARQUEZ then told GOMEZ that he was going to give him the names of the people who owed him "big shit."

(11)  In or about February 27, 2009, during a telephone conversation, ROBERT CARILLO instructed a confidential informant ("CI2") to meet him at MARK GIL's residence.  At GIL's residence,

27

CARILLO sold to the CI a large amount of methamphetamine for $4,500.00 (this was a controlled buy under the supervision of law enforcement agents). The methamphetamine was later tested at the DEA-Southwest lab and was found to have a net weight of 98.8 grams of methamphetamine with 48 grams of actual methamphetamine (after accounting for the purity).

(12) On or about April 10, 2009, at approximately 9:15 a.m., using coded language in a telephone conversation, VANESSA GARCIA provided NEVAREZ information concerning the arrest and custody status of ESR member C.V. and discussed with NEVAREZ the collection of drug proceeds from individuals who owed drug money. NEVAREZ said that he would discuss the matter with CARRILLO. VANESSA GARCIA then told NEVAREZ that ALLEXXIS SMITH needed more methamphetamine and that she (VANESSA GARCIA) had agreed to get the methamphetamine for ALLEXXIS SMITH.

(13) On or about April 10, 2009, at approximately 9:40 a.m., using coded language in a telephone conversation, VANESSA GARCIA discussed with CARRILLO the arrest of ESR member C.V. and the amount of drug money owed by ALLEXXIS SMITH to CARRILLO.

(14) On or about April 10, 2009, at approximately 10:06 a.m., using coded language in a telephone conversation, NEVAREZ inquired of VANESSA GARCIA about the amount of drug money she had collected. NEVAREZ then told VANESSA GARCIA that CARRILLO was going to go collect the money from her (GARCIA).

(15) On or about May 1, 2009, at approximately 10:28 a.m., using coded language during a telephone conversation, CHRISTOPHER NEVAREZ discussed with ROBERT CARRILLO purchasing drugs from CARRILLO. During the telephone conversation, NEVAREZ said that he did not want to be waiting around while the "juras passed by" ("juras" is a slang term used to refer to the police).

(16) On or about May 1, 2009, at approximately 10:31 a.m., using coded language during a telephone conversation, CARRILLO discussed with NEVAREZ collecting tax money. During this telephone conversation, NEVAREZ said: "Tell him to give it to you dog." CARRILLO responded: "Alright, I'll get it today homie; I'm going to get the fifty. I'll give you fifty."

(17) On May 1, 2009, and May 2, 2009, using coded language in telephone conversations, ROBERT CARRILLO discussed with CHRISTOPHER NEVAREZ getting a 9-mm handgun for NEVAREZ after NEVAREZ had a violent encounter with Casa Blanca gang members.

(18) On or about May 2, 2009, at approximately 11:07 a.m., using coded language in a telephone call, ANDREW MORENO and CHRISTOPHER NEVAREZ discussed drug money owed by others to NEVAREZ, how some of that money owed should be deducted from the payments being made to co-conspirator C (the wife of HERNANDEZ), that CARRILLO had already explained to co-conspirator C how the payments would be made, that NEVAREZ was already giving co-conspirator C half of the tax money NEVAREZ is collecting, and

29

that NEVAREZ does not understand why she is still complaining.

(19) On or about May 2, 2009, at approximately 11:18 a.m., using coded language in a telephone call, CHRISTOPHER NEVAREZ and ROBERT CARRILLO discussed payments being made to co-conspirator C and that co-conspirator C is still asking questions about the money being deducted from the tax money even though they (NEVAREZ and CARRILLO) had already explained the deductions to her.

(20) On or about May 10, 2009, during a telephone call from the Robert Presley Detention Center, RONNIE MARQUEZ discussed with JOHNNIE GOMEZ drug money owed to ROBERT CARRILLO and drug money owed to RONNIE MARQUEZ.  RONNIE MARQUEZ told JOHNNIE GOMEZ to be careful about the gang injunctions.  JOHNNIE MARQUEZ instructed JOHNNIE GOMEZ to watch what he said on the telephone.

(21) On or about May 18, 2009, using coded language in a recorded call, ROBERT CARRILLO discussed with ALLAN STALEY selling him (STALEY) methamphetamine.

(22) On or about May 20, 2009, at approximately 10:32 p.m., using coded language in a telephone conversation, MARK GIL asked ROBERT CARRILLO if he (CARRILLO) was watching channel 11 because they had a segment on how law enforcement could locate someone through the location of that person's cellular telephone.

(23) On or about May 21, 2009, at approximately 11:16 p.m., using coded language in a recorded telephone conversation, MARK GIL discussed with ROBERT CARRILLO counting drug proceeds.

(24) On or about May 22, 2009, using coded language during a telephone call, ROBERT CARRILLO discussed with ALLAN STALEY selling methamphetamine to him (STALEY).

(25) On or about May 22, 2009, at approximately 10:58 a.m., using coded language in a telephone conversation, NEVAREZ told CARRILLO that he was going to pick-up drug money from VANESSA GARCIA.

(26) On or about May 22, 2009, at approximately 12:59 p.m., using coded language during a telephone conversation, CARRILLO discussed with ALLAN STALEY the sale of methamphetamine by CARRILLO to STALEY.

(27) On or about May 22, 2009, at approximately 2:05 p.m., using coded language during a telephone conversation, CARRILLO and STALEY discussed meeting in the Food-For-Less store parking lot to complete a drug transaction.

(28) On or about May 22, 2009, at approximately 3:00 p.m., DEANNA WAGNER drove ALLAN STALEY to the parking lot of the Food-For-Less store in Riverside to purchase methamphetamine from ROBERT CARRILLO.

(29) On or about May 22, 2009, at approximately 3:00 p.m., ALLAN STALEY purchased for sale from CARRILLO 27.0 grams of actual methamphetamine.

(30) On or about May 22, 2009, at approximately 3:47 p.m., after ALLAN STALEY was arrested by law enforcement officers,

31

DEANNA WAGNER called CARRILLO and asked him if he would help out with ALLAN STALEY's bail.  CARRILLO said he would.

(31) On or about May 22, 2009, at approximately 3:57 p.m., using coded language during a telephone conversation, CARRILLO told MARK GIL that ALLAN STALEY was arrested after law enforcement found the methamphetamine in his car.

(32) On or about May 22, 2009, at approximately 3:59 p.m., using coded language during a telephone conversation, CARRILLO called NEVAREZ and told him that he (CARRILLO) was going to shut down the drug sales operation because STALEY was arrested and he (CARRILLO) feared that the police were on to him.  NEVAREZ replied that he did not think that he and CARRILLO should shut down the drug distribution business.

(33) On or about May 22, 2009, at approximately 4:21 p.m., during a telephone conversation, CARRILLO discussed with WAGNER and with another individual the arrest of STALEY.

(34) On or about May 22, 2009, at approximately 4:37 p.m., using coded language during a telephone conversation, GOMEZ discussed with CARRILLO the collection of drug proceeds on behalf of CARRILLO.  GOMEZ told CARRILLO that he had $900 on him. CARRILLO went on to tell GOMEZ to get a new phone number because he (CARRILLO) was also getting a new number.  Referring to law enforcement, CARRILLO said: "Just don't say shit on the phone doggie ... 'Cause they're checking out everything.  They're deep

32

homie."  Referring to a police scanner, GOMEZ later said: "Alright, well I am going to get a scanner.  You want a scanner?" to which CARRILLO replied: "Yeah."

(35) On or about May 29, 2009, at approximately 6:04 p.m., using coded language during a telephone conversation, JOHNNIE GOMEZ discussed with ROBERT CARRILLO picking up from CARRILLO a supply of methamphetamine to sell.

(36) On or about May 29, 2009, at approximately 9:24 p.m., using coded language during a telephone call, ROBERT CARRILLO discussed methamphetamine supply with JOHNNIE GOMEZ.

(37) On or about June 6, 2009, at approximately 1:18 p.m., using coded language during a telephone call, ROBERT CARRILLO told JOHNNIE GOMEZ that he would supply GOMEZ with methamphetamine to sell.

(38) On or about June 7, 2009, at approximately 4:22 p.m., using coded language during a telephone call, JOHNNIE GOMEZ told ROBERT CARRILLO that he (GOMEZ) had $300 or $400 on him and was waiting to collect from a third party so he could pay CARRILLO $800 from the sale of methamphetamine.

(39) On or about June 10, 2009, at approximately 5:24 p.m., using coded language during a telephone conversation, CARRILLO discussed selling illegal drugs to another individual.

(40) On or about June 11, 2009, at approximately 2:53 p.m., using coded language in a telephone conversation, CARRILLO

discussed with VANESSA GARCIA money she owed him from the sale of drugs.

(41) On or about June 11, 2009, at approximately 7:24 p.m., using coded language in a telephone conversation, CARRILLO discussed with VANESSA GARCIA the collection of money from the sale of drugs.

(42) On or about June 11, 2009, at approximately 8:45 p.m., using coded language in a telephone conversation, VANESSA GARCIA told CARRILLO she had money for him from the sale of drugs.

(43) On or about June 11, 2009, at approximately 11:27 p.m., using coded language in a recorded conversation, ROBERT CARRILLO and MARK GIL discussed picking up drug proceeds from VANESSA GARCIA.

(44) On or about June 12, 2009, at approximately 1:10 p.m., using coded language in a telephone conversation, ROBERT CARRILLO and MARK GIL discussed the sale of drugs and the collection of drug proceeds.  GIL told CARRILLO that he (GIL) had told another person who owed money from the sale of drugs that that person had better come up with all the money owed.

(45) On or about June 17, 2009, using coded language during a telephone conversation, ROBERT CARRILLO and JOHNNY GOMEZ made arrangements to meet so that GOMEZ could provide CARRILLO with drugs.

(46) On or about June 17, 2009, ROBERT CARRILLO met with

34

JOHNNY GOMEZ in the parking lot of a Wells Fargo Bank in Riverside
for the purpose of collecting drug proceeds from GOMEZ.

(47) On or about June 17, 2009, at approximately 11:06 a.m.,
using coded language during a telephone conversation, CARRILLO
discussed with GOMEZ providing VANESSA GARCIA with drugs.

(48) On or about June 17, 2009, at approximately 11:45 a.m.,
using coded language during a telephone conversation, NEVAREZ told
CARRILLO that he (NEVAREZ) had money for CARRILLO from drug sales.
NEVAREZ and CARRILLO agreed to meet at a local fast-food restaurant
to exchange the money.

(49) On or about June 17, 2009, at approximately 11:49 a.m.,
using coded language during a telephone conversation, CARRILLO
discussed with an co-conspirator ("co-conspirator D") conducting a
drug transaction.

(50) On or about June 17, 2009, at approximately 11:52 a.m.,
MARK GIL drove CARRILLO to meet NEVAREZ so that CARRILLO could pick
up drug proceeds from NEVAREZ.

(51) On or about June 17, 2009, at approximately 11:57 a.m.,
CARRILLO discussed a drug transaction with co-conspirator D.

(52) On or about June 17, 2009, at approximately 2:08 p.m.,
using coded language during a telephone conversation, CARRILLO
discussed a drug transaction with co-conspirator D.

(53) On or about June 19, 2009, at approximately 8:22 p.m.,
using coded language during a telephone conversation, CARRILLO

35

discussed the price of drugs with co-conspirator D.

(54) On or about June 19, 2009, at approximately 4:18 p.m., using coded language in a recorded conversation, MARK GIL told ROBERT CARRILLO that drugs will be ready the next day.

(55) On or about June 19, 2009, at approximately 5:49 p.m., using coded language in a recorded conversation, MARK GIL told ROBERT CARRILLO that there was a police checkpoint and to try and avoid going where the checkpoint was.

(56) On or about June 20, 2009, at approximately 1:00 p.m., using coded language during a telephone conversation, CARRILLO discussed a drug transaction with co-conspirator D.

(57) On or about June 20, 2009, at approximately 2:35 p.m., using coded language during a telephone conversation, CARRILLO discussed dropping off money for drugs purchased from co-conspirator D.

(58) On or about June 20, 2009, co-conspirator D possessed with intent to distribute 27.1 grams of a mixture or substance containing a detectable amount of cocaine.

(59) On or about June 21, 2009, at approximately 8:01 p.m., using coded language in a recorded conversation, ROBERT CARRILLO and MARK GIL discussed drug money owed by a drug buyer.

(60) On or about June 21, 2009, at approximately 8:12 p.m., using coded language in a recorded conversation, ROBERT CARRILLO and MARK GIL discussed drug proceeds and weight of drugs.

36

(61) On or about June 22, 2009, at approximately 10:58 a.m., using coded language during a telephone conversation, NEVAREZ told CARRILLO that he was going to pick-up drug proceeds from "Pookie" (which is the moniker for VANESSA GARCIA), and deliver it to CARRILLO.

(62) On or about June 26, 2009, SAMUEL AGUIRRE, at the direction of ROBERT CARRILLO, drove L.F. to a residence so that L.F. could be attacked by other ESR members.

(63) On or about June 26, 2009, ROBERT CARRILLO ordered other ESR members, including CHRISTOPHER NEVAREZ, to kill L.F.

(64) On or about June 26, 2009, at the direction of ROBERT CARRILLO, CHRISTOPHER NEVAREZ chased after and shot at L.F. in an attempt to kill L.F.

(65) On or about July 3, 2009, three co-conspirators assaulted L.F. with a baseball bat.

(66) On or about July 14, 2009, VANESSA GARCIA possessed drug pay/owe sheets and notes with the name of SALVADOR HERNANDEZ, and a photo album containing photographs of ESR gang members, including ROBERT CARRILLO, and CHRISTOPHER NEVAREZ.

## 3. CHRISTOPHER NEVAREZ

(1)  On or about February 5, 2009, using coded language in a letter to SALVADOR HERNANDEZ, CHRISTOPHER NEVAREZ discussed giving money obtained from criminal activities to HERNANDEZ's wife so that she could put the money on HERNANDEZ's prison account, as well as

the work that he (NEVAREZ) and ROBERT CARRILLO were doing on behalf of HERNANDEZ in Riverside.

(2)   On or about February 19, 2009, NEVAREZ discussed with another individual the collection of tax money from a business on behalf of SALVADOR HERNANDEZ.

(3)   On or about February 23, 2009, using coded language during a telephone conversation, NEVAREZ told another individual that he was waiting on his methamphetamine source of supply to come back from Mexico.

(4)   On or about February 28, 2009, using coded language in a letter to SALVADOR HERNANDEZ, a co-conspirator ("co-conspirator A") discussed Mexican Mafia activities within the community and that he was informed by CHRISTOPHER NEVAREZ that he (co-conspirator A) was not authorized to work on behalf of HERNANDEZ in Riverside.

(5)   On or about April 3, 2009, using coded language in a letter to a ("co-conspirator B"), SALVADOR HERNANDEZ told co-conspirator B that CHRISTOPHER NEVAREZ was working on behalf of SALVADOR HERNANDEZ and that those gang members loyal to co-conspirator B should leave NEVAREZ alone.

(6)   On or about April 7, 2009, using coded language in a letter to CHRISTOPHER NEVAREZ, SALVADOR HERNANDEZ stated that he (HERNANDEZ) is glad that  NEVAREZ is in the community providing HERNANDEZ's wife with the proceeds from drug sales, that he (HERNANDEZ) is aware that NEVAREZ had problems with other gang

members who questioned NEVAREZ's EME association, and that he (HERNANDEZ) wrote a letter to the individual who was giving NEVAREZ problems expressing his (HERNANDEZ's) displeasure with that.

(7)  On or about April 7, 2009, at approximately 2:20 p.m., using coded language in a recorded conversation, VANESSA GARCIA agreed to drive NEVAREZ to the city of Fontana to pick-up drug proceeds.

(8)  On or about April 10, 2009, at approximately 9:15 a.m., using coded language in a telephone conversation, VANESSA GARCIA provided NEVAREZ information concerning the arrest and custody status of ESR member C.V. and discussed with NEVAREZ the collection of drug proceeds from individuals who owed drug money.  NEVAREZ said that he would discuss the matter with CARRILLO.  VANESSA GARCIA then told NEVAREZ that ALLEXXIS SMITH needed more methamphetamine and that she (VANESSA GARCIA) had agreed to get the methamphetamine for ALLEXXIS SMITH.

(9)  On or about April 10, 2009, at approximately 10:06 a.m., using coded language in a telephone conversation, NEVAREZ inquired of VANESSA GARCIA about the amount of drug money she had collected. NEVAREZ then told VANESSA GARCIA that CARRILLO was going to go collect the money from her (GARCIA).

(10) On or about April 10, 2009, at approximately 8:17 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she owed him $650 from the sale of drugs and that

39

she had already paid four hundred and some dollars.

(11) On or about April 12, 2009, at approximately 10:56 a.m., using coded language in a telephone conversation, NEVAREZ asked VANESSA GARCIA if she had any money from the sale of methamphetamine.   VANESSA GARCIA replied that she did.   NEVAREZ then informed VANESSA GARCIA that he would come by to pick up the money.

(12) On or about April 12, 2009, at approximately 1:51 p.m., using coded language in a telephone conversation, NEVAREZ asked VANESSA GARCIA if she needed a re-supply of methamphetamine. VANESSA GARCIA replied that she did.

(13) On or about April 12, 2009, at approximately 6:27 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she found the methamphetamine buyer that owed drug money but that the methamphetamine buyer had no money to pay. NEVAREZ replied that the methamphetamine buyer better come up with some money to pay.

(14) On or about April 23, 2009, using coded language in a telephone conversation, an ESR member told CHRISTOPHER NEVAREZ that he (the other ESR member) was about to get a firearm.

(15) On or about April 24, 2009, using coded language in a telephone conversation, an ESR member told CHRISTOPHER NEVAREZ that his "homie" had two handguns for sale.

(16) On or about May 1, 2009, at approximately 10:28 a.m.,

40

using coded language during a telephone conversation, CHRISTOPHER NEVAREZ discussed with ROBERT CARRILLO purchasing drugs from CARRILLO. During the telephone conversation, NEVAREZ said that he did not want to be waiting around while the "juras passed by" ("juras" is a slang term used to refer to the police).

(17) On or about May 1, 2009, at approximately 10:31 a.m., using coded language during a telephone conversation, CARRILLO discussed with NEVAREZ collecting tax money. During this telephone conversation, NEVAREZ said: "Tell him to give it to you dog." CARRILLO responded: "Alright, I'll get it today homie; I'm going to get the fifty. I'll give you fifty."

(18) On or about May 1, 2009, at approximately 2:34 p.m., using coded language in a telephone conversation, CHRIS GARCIA told NEVAREZ that he was gathering money from drug proceeds to give to NEVAREZ.

(19) On or about May 1, 2009, at approximately 8:54 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she had money for him from the sale of drugs. NEVAREZ told VANESSA GARCIA that he also had a supply of methamphetamine for her.

(20) On May 1, 2009, and May 2, 2009, using coded language in telephone conversations, ROBERT CARRILLO discussed with CHRISTOPHER NEVAREZ getting a 9-mm handgun for NEVAREZ after NEVAREZ had a violent encounter with Casa Blanca gang members.

41

(21) On or about May 1, 2009, at approximately 2:44 p.m., using coded language in a telephone call, ANDREW MORENO and CHRISTOPHER NEVAREZ discussed money to be paid to co-conspirator C.

(22) On or about May 1, 2009, at approximately 8:54 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she had money for him from the sale of drugs. NEVAREZ told VANESSA GARCIA that he also had a supply of methamphetamine for her.

(23) On or about May 2, 2009, at approximately 11:07 a.m., using coded language in a telephone call, ANDREW MORENO and CHRISTOPHER NEVAREZ discussed drug money owed by others to NEVAREZ, how some of that money owed should be deducted from the payments being made to co-conspirator C (the wife of HERNANDEZ), that CARRILLO had already explained to co-conspirator C how the payments would be made, that NEVAREZ was already giving co-conspirator C half of the tax money NEVAREZ is collecting, and that NEVAREZ does not understand why she is still complaining.

(24) On or about May 2, 2009, at approximately 11:18 a.m., using coded language in a telephone call, CHRISTOPHER NEVAREZ and ROBERT CARRILLO discussed payments being made to co-conspirator C and that co-conspirator C is still asking questions about the money being deducted from the tax money even though they (NEVAREZ and CARRILLO) had already explained the deductions to her.

(25) On or about May 3, 2009, at approximately 10:03 a.m.,

42

using coded language in a telephone conversation, VANESSA GARCIA discussed with NEVAREZ the weight of methamphetamine for sale.

(26) On or about May 22, 2009, at approximately 10:58 a.m., using coded language in a telephone conversation, NEVAREZ told CARRILLO that he was going to pick-up drug money from VANESSA GARCIA.

(27) On or about May 22, 2009, at approximately 3:59 p.m., using coded language during a telephone conversation, CARRILLO called NEVAREZ and told him that he (CARRILLO) was going to shut down the drug sales operation because STALEY was arrested and he (CARRILLO) feared that the police were on to him. NEVAREZ replied that he did not think that he and CARRILLO should shut down the drug distribution business.

(28) On or about May 22, 2009, at approximately 3:59 p.m., using coded language during a telephone conversation, CARRILLO called NEVAREZ and told him that he (CARRILLO) was going to shut down the drug sales operation because STALEY was arrested and he (CARRILLO) feared that the police were on to him. NEVAREZ replied that he did not think that he and CARRILLO should shut down the drug distribution business.

(29) On or about June 17, 2009, at approximately 11:45 a.m., using coded language during a telephone conversation, NEVAREZ told CARRILLO that he (NEVAREZ) had money for CARRILLO from drug sales. NEVAREZ and CARRILLO agreed to meet at a local fast-food restaurant

43

to exchange the money.

(30) On or about June 17, 2009, at approximately 11:52 a.m., MARK GIL drove CARRILLO to meet NEVAREZ so that CARRILLO could pick up drug proceeds from NEVAREZ.

(31) On or about June 22, 2009, at approximately 10:58 a.m., using coded language during a telephone conversation, NEVAREZ told CARRILLO that he was going to pick-up drug proceeds from "Pookie" (which is the moniker for VANESSA GARCIA), and deliver it to CARRILLO.

(32) On or about June 26, 2009, ROBERT CARRILLO ordered other ESR members, including CHRISTOPHER NEVAREZ, to kill L.F.

(33) On or about June 26, 2009, at the direction of ROBERT CARRILLO, CHRISTOPHER NEVAREZ chased after and shot L.F. in an attempt to kill L.F.

(34) On or about July 3, 2009, three co-conspirators assaulted L.F. with a baseball bat.

(35) On or about July 14, 2009, VANESSA GARCIA possessed drug pay/owe sheets and notes with the name of SALVADOR HERNANDEZ, and a photo album containing photographs of ESR gang members, including ROBERT CARRILLO, and CHRISTOPHER NEVAREZ.

**4. RONNIE MARQUEZ**

(1)  On or about February 10, 2009, at approximately 12:23 p.m., during a telephone conversation, JOHNNY GOMEZ discussed with RONNIE MARQUEZ the payment and collection of drug proceeds.

Referring to  CARRILLO by his moniker "Pato," GOMEZ told MARQUEZ:
"I paid a thousand dollars to 'Pato' for the $2,200 you owed."
GOMEZ went on to tell MARQUEZ: "Pato asked where the dope was at
because you did not get caught with dope."   MARQUEZ then told
GOMEZ that he was going to give him the names of the people who
owed him "big shit."

(2)  On or about April 20, 2009, IGNACIO CHAVEZ and VANESSA
GARCIA talked about target subject RONNIE MARQUEZ and discussed
retrieving a laptop computer that contained the user names and
passwords for the financial accounts of a third-party.

(3)  On or about April 23, 2009, at approximately 8:38 a.m.,
using coded language in a recorded conversation, VANESSA GARCIA
discussed with RONNIE MARQUEZ ESR gang business, including money
owed.

(4)  On or about May 10, 2009, during a telephone call from
the Robert Presley Detention Center, RONNIE MARQUEZ discussed with
JOHNNIE GOMEZ drug money owed to ROBERT CARRILLO and drug money
owed to RONNIE MARQUEZ.   RONNIE MARQUEZ told JOHNNIE GOMEZ to be
careful about the gang injunctions.   JOHNNIE MARQUEZ instructed
JOHNNIE GOMEZ to watch what he said on the telephone.

## 5. **IGNACIO CHAVEZ**

(1)  On or about April 18, 1999, IGNACIO CHAVEZ admitted
membership in the Patterson Park clique of ESR.

(2)  On or about June 9, 1999, IGNACIO CHAVEZ admitted

membership in the Tiny Dukes clique of ESR.

(3) On or about December 28, 2000, IGNACIO CHAVEZ admitted membership in ESR Tiny Dukes clique to an officer with the Riverside Police Department.

(4) On December 5, 2008, officers saw ARREDONDO and Ignacio CHAVEZ sitting together in a vehicle in a high drug traffic area. As soon as ARREDONDO and CHAVEZ saw officers patrolling the area, they exited the vehicle and began walking away. Officers then contacted ARREDONDO and CHAVEZ. A records check revealed that ARREDONDO was on probation for possession of controlled substances, and CHAVEZ was a documented ESR gang member served with a gang injunction. During a probation search of ARREDONDO, officers found in his shorts pocket a clear plastic pill container containing a clear plastic bag. In the bag were methamphetamine and small clear plastic ziplock bags commonly used to package narcotics. During a search incident to ARREDONDO's arrest for drug possession, officers found $138 cash in ARREDONDO's wallet. CHAVEZ was also arrested for violating curfew pursuant to a gang injunction. Incident to both of their arrests, officers searched the vehicle in which ARREDONDO and CHAVEZ were sitting. In the vehicle, on the driver seat, officers found a nylon bag with a red pouch containing $300 cash (1 $100 bill, 10 $20 bills), a mini calendar book with $54 cash inside (6 $5 bills, 24 $1 bills), and $250 cash folded up in a rubber band (8 $20 bills, 4 $10 bills, 10 $5 bills) – a total of $604.

46

Officers also found a mini digital measuring scale near the air vent next to the steering wheel and a knit glove with a plastic baggie inside containing methamphetamine. ARREDONDO also had a key to a room in a hotel nearby and officers conducted a probation search of the hotel room after confirming with the desk clerk that ARREDONDO had rented the room. On the bed inside ARREDONDO's hotel room, officers found a digital scale and a glass smoking pipe with powdery residue and burn marks. The methamphetamine found inside the knit glove in the vehicle had a total gross weight of approximately 17.7 grams. The 17.7 grams of methamphetamine were recently tested at the DEA-Southwest lab and were found to contain a net of 15.4 grams of methamphetamine and 12.3 grams of actual methamphetamine.

(5) On or about April 20, 2009, IGNACIO CHAVEZ and VANESSA GARCIA talked about target subject RONNIE MARQUEZ and discussed retrieving a laptop computer that contained the user names and passwords for the financial accounts of a third-party.

(6) On or about September 9, 2009, IGNACIO CHAVEZ maintained a MySpace web page on a photograph with other ESR members, a photograph of CHAVEZ throwing a "TD" hand sign, and the text "ES.RIVA" and the "Tiny Dukes Are Back."

## 6. ANDREW MORENO

(1) On or about May 1, 2009, at approximately 2:44 p.m., using coded language in a telephone call, ANDREW MORENO and

47

CHRISTOPHER NEVAREZ discussed money to be paid to co-conspirator C.

(2)  On or about May 2, 2009, at approximately 11:07 a.m., using coded language in a telephone call, ANDREW MORENO and CHRISTOPHER NEVAREZ discussed drug money owed by others to NEVAREZ, how some of that money owed should be deducted from the payments being made to co-conspirator C (the wife of HERNANDEZ), that CARRILLO had already explained to co-conspirator C how the payments would be made, that NEVAREZ was already giving co-conspirator C half of the tax money NEVAREZ is collecting, and that NEVAREZ does not understand why she is still complaining.

## 7. DANIEL PADRON

(1)  On April 11, 1994, upon contact by a Riverside Police detective, Padron admitted that he was a member of ESR-Tiny Dukes. The detective noted that Padron had tattoos of "ESR" on his left arm and "TDKS" on his right arm.

(2)  On August 28, 1998, September 13, 1998, September 26, 1998, October 30, 1998, February 11, 1999, May 3, 1999, and May 26, 1999, officers contacted or detained Padron for various reasons, including suspicion of drinking in a public place and traffic stops. Each time, Padron admitted to his ESR membership. Officers noted the same tattoos on Padron as described above.

(3)  On May 27, 1999, Padron and Ignacio Chavez, a known ESR member, were arrested for being under the influence of a controlled substance. Padron was found with a blue baseball cap with a dark

48

blue "D" printed on the front. Inside the cap, "ESR Px Parke TDKS" was written. This type of cap was a Duke Blue Devils hat that was commonly worn by ESR-Tiny Dukes gang members. The "ESR Px Parke TDKS" notes the Patterson Park area of Riverside that the Tiny Dukes claim as their territory. Inside Padron's wallet, a piece of paper with gang graffiti was found.

(4) On November 8, 1999, Padron was arrested (and later convicted as described above) for vehicle burglary. Arrested with him, was Richard Moreno, another known ESR gang member.

(5) On November 30, 1999, during an arrest of Padron for being under the influence of a controlled substance, Padron admitted to a sergeant that he is a member of "Tiny Dukes," and that his monikers were "Danny Boy" and "Sneaky." The sergeant noted that Padron had tattoos of "ESR" on his left forearm and "TDKS" on the back of his right forearm. The sergeant also noted that Padron was wearing a black cap with "P" printed on it and a chain with a "D" design.

(6) On March 23, 2000, a Riverside Police detective contacted Padron because he had an outstanding felony warrant for his arrest. During a search incident to arrest, a glass smoking pipe with methamphetamine residue and a small plastic baggie of methamphetamine were found in Padron's pockets. At that time, Padron admitted his ESR-Tiny Dukes membership and stated that his moniker was "Sneeks."

49

(7)  On July 5, 2000, during a probation search of Padron's residence, officers found clothing, pictures, and paperwork displaying "East Side Riva" gang graffiti and symbols.

(8)  On February 16, 2001, Padron was arrested (and later convicted as described above) for transportation and possession for sale of controlled substances.  Arrested with him, was Gregory Fonseca, another known ESR gang member.

(9)  On December 17, 2001, Padron was arrested, along with Frank Mendez, a known ESR member, were arrested after fleeing from officers on patrol.  Padron admitted to his ESR membership.  Padron had tattoos of "ESR" on his forearm, "RIVA" on his chest, "ES" on his right middle finger, and three dots on his left wrist.

(10) On October 20, 2002 and February 26, 2005, upon contact by an officer, Padron admitted to his ESR-Tiny Dukes membership. Several gang tattoos were noted.

(11) On February 1, 2007, a detective found on the MySpace website, a site titled, "Lil Blue Eyes."  The site had photographs of Padron and his tattoos.  There were new tattoos of "Eastside Riva" on Padron's chest and "Tiny Dukes" on Padron's stomach.

(12) On or about April 30, 2007, DANIEL PADRON possessed a police scanner programmed to the Riverside Police Department radio broadcasts, a digital scale, 515.42 grams of a mixture and substance containing a detectable amount of methamphetamine (279.6 grams of actual methamphetamine), two cell phones, drug pay/owe

50

sheets, and over $2000 in cash.

8. **MARK GIL**

(1)  On or about August 14, 1999, MARK GIL admitted to an officer of the Riverside Police Department that he was a member of ESR.

(2)  On or about May 20, 2009, at approximately 10:32 p.m., using coded language in a telephone conversation, MARK GIL asked ROBERT CARRILLO if he (CARRILLO) was watching channel 11 because they had a segment on how law enforcement could locate someone through the location of that person's cellular telephone.

(3)  On or about May 21, 2009, at approximately 11:16 p.m., using coded language in a recorded telephone conversation, MARK GIL discussed with ROBERT CARRILLO counting drug proceeds.

(4)  On or about June 11, 2009, at approximately 11:27 p.m., using coded language in a recorded conversation, ROBERT CARRILLO and MARK GIL discussed picking up drug proceeds from VANESSA GARCIA.

(5)  On or about June 12, 2009, at approximately 1:10 p.m., using coded language in a telephone conversation, ROBERT CARRILLO and MARK GIL discussed the sale of drugs and the collection of drug proceeds.  GIL told CARRILLO that he (GIL) had told another person who owed money from the sale of drugs that that person had better come up with all the money owed.

(6)  On or about June 17, 2009, at approximately 11:52 a.m.,

51

MARK GIL drove CARRILLO to meet NEVAREZ so that CARRILLO could pick up drug proceeds from NEVAREZ.

(7) On or about June 19, 2009, at approximately 4:18 p.m., using coded language in a recorded conversation, MARK GIL told ROBERT CARRILLO that drugs will be ready the next day.

(8) On or about June 19, 2009, at approximately 5:49 p.m., using coded language in a recorded conversation, MARK GIL told ROBERT CARRILLO that there was a police checkpoint and to try and avoid going where the checkpoint was.

(9) On or about June 21, 2009, at approximately 8:01 p.m., using coded language in a recorded conversation, ROBERT CARRILLO and MARK GIL discussed drug money owed by a drug buyer.

(10) On or about June 21, 2009, at approximately 8:12 p.m., using coded language in a recorded conversation, ROBERT CARRILLO and MARK GIL discussed drug proceeds and weight of drugs.

## 9. JOSE ARRENDONDO

(1) According to an RPD ESR gang expert, Arredondo is known as an ESR associate. He is closely connected to Ignacio Chavez, a well known ESR member and shot-caller. On December 5, 2008, officers saw Arredondo and Ignacio Chavez sitting together in a vehicle in a high drug traffic area. As soon as Arredondo and Chavez saw officers patrolling the area, they exited the vehicle and began walking away. Officers then contacted Arredondo and Chavez. A records check revealed that Arredondo was on probation

for possession of controlled substances, and Chavez was a documented ESR gang member served with a gang injunction.

(2)   During a probation search of Arredondo, officers found in his shorts pocket a clear plastic pill container containing a clear plastic bag.   In the bag were methamphetamine and small clear plastic ziplock bags commonly used to package narcotics.   During a search incident to Arredondo's arrest for drug possession, officers found $138 cash in Arredondo's wallet. Chavez was also arrested for violating curfew pursuant to a gang injunction.

(3)   Incident to both of their arrests, officers searched the vehicle in which Arredondo and Chavez were sitting.   In the vehicle, on the driver seat, officers found a nylon bag with a red pouch containing $300 cash (1 $100 bill, 10 $20 bills), a mini calendar book with $54 cash inside (6 $5 bills, 24 $1 bills), and $250 cash folded up in a rubber band (8 $20 bills, 4 $10 bills, 10 $5 bills) – a total of $604.   Officers also found a mini digital measuring scale near the air vent next to the steering wheel and a knit glove with a plastic baggie inside containing methamphetamine. Arredondo also had a key to a room in a hotel nearby and officers conducted a probation search of the hotel room after confirming with the desk clerk that Arredondo had rented the room.   On the bed inside Arredondo's hotel room, officers found a digital scale and a glass smoking pipe with powdery residue and burn marks.   The methamphetamine found inside the knit glove in the vehicle had a

53

total gross weight of approximately 17.7 grams. The 17.7 grams of methamphetamine were recently tested at the DEA-Southwest lab and were found to contain a net of 15.4 grams of methamphetamine and 12.3 grams of actual methamphetamine.

## 10. JOHNNY GOMEZ

(1) On or about February 10, 2009, at approximately 12:23 p.m., during a telephone conversation, JOHNNY GOMEZ discussed with RONNIE MARQUEZ the payment and collection of drug proceeds. Referring to CARRILLO by his moniker "Pato," GOMEZ told MARQUEZ: "I paid a thousand dollars to 'Pato' for the $2,200 you owed." GOMEZ went on to tell MARQUEZ: "Pato asked where the dope was at because you did not get caught with dope." MARQUEZ then told GOMEZ that he was going to give him the names of the people who owed him "big shit."

(2) On or about May 10, 2009, during a telephone call from the Robert Presley Detention Center, RONNIE MARQUEZ discussed with JOHNNIE GOMEZ drug money owed to ROBERT CARRILLO and drug money owed to RONNIE MARQUEZ. RONNIE MARQUEZ told JOHNNIE GOMEZ to be careful about the gang injunctions. JOHNNIE MARQUEZ instructed JOHNNIE GOMEZ to watch what he said on the telephone.

(3) On or about May 20, 2009, at approximately 5:00 p.m., DEANNA WAGNER drove ALLAN STALEY to the parking lot of the Food-For-Less store in Riverside to pick-up methamphetamine from JOHNNY GOMEZ.

54

(4)  On or about May 22, 2009, at approximately 4:37 p.m., using coded language during a telephone conversation, GOMEZ discussed with CARRILLO the collection of drug proceeds on behalf of CARRILLO.  GOMEZ told CARRILLO that he had $900 on him. CARRILLO went on to tell  GOMEZ to get a new phone number because he ( CARRILLO) was also getting a new number.  Referring to law enforcement,  CARRILLO said:  "Just don't say shit on the phone doggie ... 'Cause they're checking out everything.  They're deep homie." Referring to a police scanner, GOMEZ later said: "Alright, well I am going to get a scanner.  You want a scanner?" to which CARRILLO replied: "Yeah."

(5)  On or about May 29, 2009, at approximately 6:04 p.m., using coded language during a telephone conversation, JOHNNIE GOMEZ discussed with ROBERT CARRILLO picking up from CARRILLO a supply of methamphetamine to sell.

(6)  On or about May 29, 2009, at approximately 7:03 p.m., using coded language during a telephone call, JOHNNIE GOMEZ discussed with a drug purchaser the pricing of the methamphetamine GOMEZ could supply.

(7)  On or about May 29, 2009, at approximately 7:23 p.m., using coded language during a telephone call, JOHNNIE GOMEZ discussed with a drug buyer supplying the buyer with methamphetamine for $50.

(8)  On or about May 29, 2009, at approximately 7:25 p.m.,

using coded language during a telephone call, JOHNNIE GOMEZ discussed supplying a drug buyer with methamphetamine for $200.

(9) On or about May 29, 2009, at approximately 9:24 p.m., using coded language during a telephone call, ROBERT CARRILLO discussed methamphetamine supply with JOHNNIE GOMEZ.

(10) On or about May 31, 2009, at approximately 1:52 p.m., using coded language during a telephone call, JOHNNIE GOMEZ discussed selling methamphetamine to a drug buyer.

(11) On or about June 6, 2009, at approximately 1:18 p.m., using coded language during a telephone call, ROBERT CARRILLO told JOHNNIE GOMEZ that he would supply GOMEZ with methamphetamine to sell.

(12) On or about June 7, 2009, at approximately 4:22 p.m., using coded language during a telephone call, JOHNNIE GOMEZ told ROBERT CARRILLO that he (GOMEZ) had $300 or $400 on him and was waiting to collect from a third party so he could pay CARRILLO $800 from the sale of methamphetamine.

(13) On or about June 17, 2009, using coded language during a telephone conversation, ROBERT CARRILLO and JOHNNY GOMEZ made arrangements to meet so that GOMEZ could provide CARRILLO with drugs.

(14) On or about June 17, 2009, ROBERT CARRILLO met with JOHNNY GOMEZ in the parking lot of a Wells Fargo Bank in Riverside for the purpose of collecting drug proceeds from GOMEZ.

(15) On or about June 17, 2009, at approximately 11:06 a.m., using coded language during a telephone conversation, CARRILLO discussed with GOMEZ providing  VANESSA GARCIA with drugs.

## 11. **VANESSA GARCIA**

(1)  On or about April 7, 2009, at approximately 2:20 p.m., using coded language in a recorded conversation, VANESSA GARCIA agreed to drive NEVAREZ to the city of Fontana to pick-up drug proceeds.

(2)  On or about April 8, 2009, at approximately 3:05 p.m., VANESSA GARCIA called the Robert Presley Detention Center to inquire about the custody status of ESR member A.R.

(3)  On or about April 10, 2009, at approximately 9:05 a.m., VANESSA GARCIA called the Robert Presley Detention Center to inquire about the custody status of ESR member C.V.

(4)  On or about April 10, 2009, at approximately 9:12 a.m., VANESSA GARCIA called the Riverside County Sheriff's Department to inquire about the custody status and booking number of ESR member C.V.

(5)  On or about April 10, 2009, at approximately 9:15 a.m., using coded language in a telephone conversation, VANESSA GARCIA provided NEVAREZ information concerning the arrest and custody status of ESR member C.V. and discussed with NEVAREZ the collection of drug proceeds from individuals who owed drug money.   NEVAREZ said that he would discuss the matter with  CARRILLO.   VANESSA

57

GARCIA then told NEVAREZ that ALLEXXIS SMITH needed more methamphetamine and that she ( VANESSA GARCIA) had agreed to get the methamphetamine for ALLEXXIS SMITH.

(6) On or about April 10, 2009, at approximately 9:40 a.m., using coded language in a telephone conversation, VANESSA GARCIA discussed with CARRILLO the arrest of ESR member C.V. and the amount of drug money owed by ALLEXXIS SMITH to CARRILLO.

(7) On or about April 10, 2009, at approximately 10:06 a.m., using coded language in a telephone conversation, NEVAREZ inquired of VANESSA GARCIA about the amount of drug money she had collected. NEVAREZ then told VANESSA GARCIA that CARRILLO was going to go collect the money from her (GARCIA).

(8) On or about April 10, 2009, at approximately 8:17 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she owed him $650 from the sale of drugs and that she had already paid four hundred and some dollars.

(9) On or about April 10, 2009, at approximately 8:17 p.m., using coded language in a telephone conversation, VANESSA GARCIA told a methamphetamine buyer that she would deliver the drugs to him because she did not want him to come to her house to purchase the methamphetamine in the company of another person with whom she was not familiar.

(10) On or about April 11, 2009, at approximately 9:05 p.m., using coded language in a recorded conversation, VANESSA GARCIA

discussed selling methamphetamine to a methamphetamine buyer.

(11) On or about April 11, 2009, at approximately 9:57 p.m., using coded language in a recorded conversation, VANESSA GARCIA discussed with a methamphetamine buyer the sale of methamphetamine.

(12) On or about April 11, 2009, at approximately 10:08 p.m., using coded language in a telephone conversation, VANESSA GARCIA told a methamphetamine buyer to hurry-up because there were some police officers on 12th Street.

(13) On or about April 12, 2009, at approximately 10:56 a.m., using coded language in a telephone conversation, NEVAREZ asked VANESSA GARCIA if she had any money from the sale of methamphetamine. VANESSA GARCIA replied that she did. NEVAREZ then informed VANESSA GARCIA that he would come by to pick up the money.

(14) On or about April 12, 2009, at approximately 12:40 p.m., using coded language in a telephone conversation, VANESSA GARCIA told a methamphetamine buyer that she could deliver the methamphetamine to him.

(15) On or about April 12, 2009, at approximately 1:51 p.m., using coded language in a telephone conversation, NEVAREZ asked VANESSA GARCIA if she needed a re-supply of methamphetamine. VANESSA GARCIA replied that she did.

(16) On or about April 12, 2009, at approximately 3:54 p.m., using coded language in a telephone conversation, VANESSA GARCIA

discussed with a methamphetamine buyer the sale of methamphetamine.

(17) On or about April 12, 2009, at approximately 5:52 p.m., using coded language in a telephone conversation, VANESSA GARCIA told a methamphetamine buyer to come over to her house to pick up drugs.

(18) On or about April 12, 2009, at approximately 6:27 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she found the methamphetamine buyer that owed drug money but that the methamphetamine buyer had no money to pay. NEVAREZ replied that the methamphetamine buyer better come up with some money to pay.

(19) On or about April 12, 2009, at approximately 9:10 p.m., using coded language in a telephone conversation, VANESSA GARCIA gave directions to a methamphetamine buyer.

(20) On or about April 13, 2009, at approximately 12:38 p.m., using coded language in a telephone conversation, a methamphetamine buyer told VANESSA GARCIA that he came up with money to buy methamphetamine from her.

(21) On or about April 13, 2009, at approximately 12:45 p.m., VANESSA GARCIA gave a methamphetamine buyer directions to her house so that the methamphetamine could come over to purchase methamphetamine.

(22) On or about April 13, 2009, at approximately 6:46 p.m., VANESSA GARCIA discussed with a methamphetamine buyer selling him

methamphetamine.

(23) On or about April 13, 2009, at approximately 7:29 p.m., using coded language during a telephone conversation, VANESSA GARCIA discussed the sale of methamphetamine buyer by telling a methamphetamine buyer that she had one half ounce left.

(24) On or about April 15, 2009, at approximately 1:27 p.m., VANESSA GARCIA called the Riverside Sheriff's Department and inquired about the hearing date for and the charges that another ESR member was facing.

(25) On or about April 16, 2009, at approximately 2:02 p.m., using coded language in a telephone conversation, VANESSA GARCIA discussed with ALLEXXIS SMITH picking up from SMITH money from the sale of methamphetamine.

(26) On or April 16, 2009, at approximately 10:15 p.m. and 10:35 p.m., using coded language during two telephone conversations, VANESSA GARCIA discussed with a drug buyer having two grams of heroin concealed inside a balloon.

(27) On or about April 17, 2009, at approximately 12:49 p.m., using coded language in a telephone conversation, SMITH told VANESSA GARCIA that there was a methamphetamine buyer waiting to purchase methamphetamine.

(28) On or about April 17, 2009, VANESSA GARCIA possessed with intent to distribute 1.2 grams of a mixture and substance containing a detectable amount of methamphetamine.

61

(29) On or about April 17, 2009, VANESSA GARCIA distributed methamphetamine to ALLEXXIS SMITH.

(30) On or about April 20, 2009, IGNACIO CHAVEZ and VANESSA GARCIA talked about target subject RONNIE MARQUEZ and discussed retrieving a laptop computer that contained the user names and passwords for the financial accounts of a third-party.

(31) On or about April 23, 2009, at approximately 8:38 a.m., using coded language in a recorded conversation, VANESSA GARCIA discussed with RONNIE MARQUEZ ESR gang business, including money owed.

(32) On or about May 1, 2009, at approximately 8:54 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she had money for him from the sale of drugs. NEVAREZ told VANESSA GARCIA that he also had a supply of methamphetamine for her.

(33) On or about May 1, 2009, at approximately 8:54 p.m., using coded language in a telephone conversation, VANESSA GARCIA told NEVAREZ that she had money for him from the sale of drugs. NEVAREZ told VANESSA GARCIA that he also had a supply of methamphetamine for her.

(34) On or about May 3, 2009, at approximately 10:03 a.m., using coded language in a telephone conversation, VANESSA GARCIA discussed with NEVAREZ the weight of methamphetamine for sale.

(35) On or about May 22, 2009, at approximately 10:58 a.m.,

using coded language in a telephone conversation, NEVAREZ told CARRILLO that he was going to pick-up drug money from VANESSA GARCIA.

(36) On or about June 11, 2009, at approximately 2:53 p.m., using coded language in a telephone conversation, CARRILLO discussed with VANESSA GARCIA money she owed him from the sale of drugs.

(37) On or about June 11, 2009, at approximately 7:24 p.m., using coded language in a telephone conversation, CARRILLO discussed with VANESSA GARCIA the collection of money from the sale of drugs.

(38) On or about June 11, 2009, at approximately 8:45 p.m., using coded language in a telephone conversation, VANESSA GARCIA told CARRILLO she had money for him from the sale of drugs.

(39) On or about June 11, 2009, at approximately 11:27 p.m., using coded language in a recorded conversation, ROBERT CARRILLO and MARK GIL discussed picking up drug proceeds from VANESSA GARCIA.

(40) On or about June 17, 2009, at approximately 11:06 a.m., using coded language during a telephone conversation, CARRILLO discussed with GOMEZ providing VANESSA GARCIA with drugs.

(41) On or about June 22, 2009, at approximately 10:58 a.m., using coded language during a telephone conversation, NEVAREZ told CARRILLO that he was going to pick-up drug proceeds from "Pookie"

(which is the moniker for VANESSA GARCIA), and deliver it to CARRILLO.

(42) On or about July 14, 2009, VANESSA GARCIA possessed drug pay/owe sheets and notes with the name of SALVADOR HERNANDEZ, and a photo album containing photographs of ESR gang members, including ROBERT CARRILLO, and CHRISTOPHER NEVAREZ.

## 12. ALLEXXIS OLONNA SMITH

(1) On or about April 10, 2009, at approximately 9:15 a.m., using coded language in a telephone conversation, VANESSA GARCIA provided NEVAREZ information concerning the arrest and custody status of ESR member C.V. and discussed with NEVAREZ the collection of drug proceeds from individuals who owed drug money. NEVAREZ said that he would discuss the matter with CARRILLO. VANESSA GARCIA then told NEVAREZ that ALLEXXIS SMITH needed more methamphetamine and that she (VANESSA GARCIA) had agreed to get the methamphetamine for ALLEXXIS SMITH.

(2) On or about April 10, 2009, at approximately 9:40 a.m., using coded language in a telephone conversation, VANESSA GARCIA discussed with CARRILLO the arrest of ESR member C.V. and the amount of drug money owed by ALLEXXIS SMITH to CARRILLO.

(3) On or about April 16, 2009, at approximately 2:02 p.m., using coded language in a telephone conversation, VANESSA GARCIA discussed with ALLEXXIS SMITH picking up from SMITH money from the sale of methamphetamine.

(4)   On or about April 17, 2009, at approximately 12:49 p.m., using coded language in a telephone conversation, SMITH told VANESSA GARCIA that there was a methamphetamine buyer waiting to purchase methamphetamine.

(5)   On or about April 17, 2009, VANESSA GARCIA distributed methamphetamine to ALLEXXIS SMITH.

**13. CHRIS JAMES GARCIA**

(1)   On or about January 2, 1996, CHRIS GARCIA possessed with intent to distribute approximately 61.2 gross grams of a mixture and substance containing a detectable amount of methamphetamine.

(2)   On or about January 2, 1996, CHRIS GARCIA possessed approximately $8,300 as proceeds from drug sales.

(3)   On or about January 2, 1996, CHRIS GARCIA possessed three pagers, three scales, and plastic zip-lock baggies, all used in the sale of methamphetamine.

(4)   On or about March 30, 2001, CHRIS GARCIA possessed with intent to distribute methamphetamine.

(5)   On or about May 1, 2009, at approximately 2:34 p.m., using coded language in a telephone conversation, CHRIS GARCIA told NEVAREZ that he was gathering money from drug proceeds to give to NEVAREZ.

(6) On or about September 8, 2009, CHRIS GARCIA, aka "Chuco," possessed with intent to distribute 19.7 grams of a mixture or substance containing a detectable amount of methamphetamine.

(7) On or about September 8, 2009, CHRIS GARCIA possessed a digital scale and zip-lock baggies, all used in the sale of methamphetamine.

On or about September 8, 2009, CHRIS GARCIA admitted to an officer with the Riverside Police Department his past membership in the 14th Street clique of ESR.

**14. RUDY TOVAR**

(1) On January 17, 1998, officers observed Tovar associating with two ESR members in the Safety Zone. Upon contact, Tovar admitted his ESR membership. Officers noted a tattoo of three dots on the web of Tovar's left hand (symbolizing "Mi Vida Loca" or my crazy life that young gangsters often tattoo on fingers, wrists, or arms).

(2) On February 14, 2002, during a consent search of Tovar's bedroom, several items, including methamphetamine, a sawed-off shotgun, a gram scale with white residue on top, a digital scale, twenty rounds of .22 caliber ammunition, and a note with gang graffiti were found. The room was also rigged with surveillance equipment, including a police scanner and a camera monitoring the front yard area of the house. Tovar admitted that these items belonged to him. Tovar also admitted to being an ESR member when he was in high school, and that his moniker was "Dinky." He admitted to having been a member of ESR-14th Street gang, but denied being a current, active member. He did, however, state that

66

he would assist ESR gang members if they were in a fight.  Officers noted a tattoo of "I" and "E" on the backs of Tovar's arms.

(3)  On June 18, 2004, Tovar was arrested for a probation violation.   During a probation search of his residence, the following items were found: a double sided knife, six glass pipes, some of which contained methamphetamine; a .38 automatic handgun with a magazine; a Colt .45 1911 automatic handgun with a loaded magazine; an Intratech 9mm Tech 9 handgun with a magazine containing 30 rounds; one box of 9mm Luger ammunition; a box containing fifteen 9mm rounds; three 12-gauge shotgun rounds; one box of .45 auto ammunition; a black miniature scale; and a scanner tuned to the Riverside Police Department frequency.  Gang graffiti was also found in the residence.  During jail classification, Tovar claimed ESR membership.

(4)  On August 17, 2005, during a traffic stop, Tovar was found with a glass smoking pipe with white residue and burn marks on the end, several Ziplock baggies containing approximately 60 grams of methamphetamine in a zippered pouch, and a piece of plastic containing approximately 0.4 grams of black tar heroin. Tovar was later convicted of possession for sale of a controlled substance.   During booking, Tovar admitted that he was an ESR member.

(5)  On June 1, 2005, while testifying as a witness in his brother's trial, Tovar admitted to ESR membership.

67

### 15. **NATENO MORENO**

(1)  On April 21, 2005, when Moreno was arrested for being a parolee-at-large and in possession for sale of methamphetamine, he was found in the company of Gabriel Tovar, a known ESR 14th Street gang member.  On that date, Tovar was found concealing a double-sided knife with one of the blades open and in a locked position.  At the detention center after his arrest, Moreno admitted his membership in the ESR.  Moreno was subsequently convicted for possession for sale of methamphetamine.  (See criminal history above).

(2)  On May 21, 2002, Moreno was arrested and later convicted for possession for sale of methamphetamine.  During the execution of a search warrant in this incident, an officer observed a hand inside Moreno's bedroom dropping a metal container outside the bedroom window.  Inside the metal container, there were thirteen baggies containing methamphetamine.  Scratched on the lid of the metal container were "13," "LS," and "RMS."  Officers also found gang miscellaneous papers with gang graffiti with the moniker "Shorty" inside the bedroom.  (See criminal history above).

(3)  On October 15, 2002, an officer contacted Moreno at the intersection of Cottage Street and Park Avenue in Riverside. During this contact, Moreno admitted to being an ESR member.

(4)  On September 20, 2000, during a probation search of Moreno's residence and his room, officers found items displaying

gang graffiti, including a photograph of other ESR members.  The photographs had gang graffiti such as "ES RIVA, "XIVst," "RMS," and "Shorty" written on them.

(5)  On July 3, 1999, an officer contacted Moreno at the intersection of Grove Avenue and Prospect Avenue in Riverside. During this contact, Moreno admitted to being an ESR member.

(6)  On November 9, 1998, an officer contacted Moreno at the intersection of Park Avenue and 14th Street in Riverside.  During this contact, Moreno claimed ESR membership.

(7)  On July 1, 1997, officers conducted a probation search of Moreno's residence on Douglass Avenue in Riverside.  During the search, officers located gang photographs and several items in Moreno's room that displayed gang graffiti.  Officers also located a jacket with "Los Romanos," "Riva ES," and gang graffiti written on the inside with a black marker.  Moreno admitted to being an ESR member.

(8)  On August 9, 1996, an officer contacted Moreno at the Lincoln Park in Riverside.  During this contact, Moreno admitted to being an ESR member.

(9)  On July 3, 1995, an officer contacted Moreno at the intersection of Prospect Avenue and Grove Avenue in Riverside. During this contact, Moreno admitted to being an ESR member.

(10) On June 23, 1995, officers conducted a probation search of Moreno's residence on Douglass Avenue in Riverside.  During the

69

search, officers located in Moreno's room a three-ring binder containing ESR gang graffiti. Moreno also admitted to being an ESR member.

(11) On February 9, 1995, during a field contact, Moreno admitted to his ESR membership.

(12) On January 28, 1995, during a field contact, Moreno admitted to his ESR membership.

(13) Moreno has several gang-related tattoos: Three dots on his left hand; "ES" on his left finger; "SUR XIII" on his left hand; and "ES RIVA" on his right arm. Moreno uses the monikers "Nat," "Short Dog," and "Shorty."

## 16. **PAUL CORTEZ**

(1)  On October 1, 2001, upon contact by an officer, CORTEZ admitted to being an ESR member.

(2)  After being arrested for drug possession on February 20, 2006, CORTEZ admitted to being an active ESR member. The officer also noted that CORTEZ had a tattoo of "IE" – a common gang tattoo that stands for "Inland Empire" – on his arms.

(3)  On February 20, 2006, CORTEZ admitted to an RPD officer that he had in his possession drugs and a pipe. The officer conducted a consent search and found in CORTEZ's right front pants pocket a clear sandwich baggie containing nine smaller baggies and one small clear bindle. All of these items contained methamphetamine and were individually marked – 10, 30, and 40 –

reflecting the selling prices.  The officer also found in a sock a clear baggie containing two bindles.  Inside each bindle were five baggies containing methamphetamine.  A digital scale and a cell phone were also found in CORTEZ's clothing.  CORTEZ admitted that he was an active ESR member, but refused to state his moniker. CORTEZ had the tattoos "IE" on his left and right arms.  The total gross weight of the methamphetamine found was approximately 17.1 grams.  The 17.1 grams of methamphetamine were recently tested at the DEA-Southwest lab and were found to have a net weight of 7.3 grams of methamphetamine with 3.6 grams of actual methamphetamine.

(4)  On March 8, 2006, officers made a traffic stop and discovered a loaded gun in the vehicle that CORTEZ was in.  Raymond Cardenas, a well known ESR member, was also in the vehicle.  Cortez was arrested and admitted during jail classification that he was an ESR member.

(5)  On November 17, 2006, Cortez admitted during jail classification that the was affiliated with the ESR, and that his moniker was "Wiskers."

## 17. ALLAN STALEY

(1)  On or about May 18, 2009, using coded language in a recorded call, ROBERT CARRILLO discussed with ALLAN STALEY selling him (STALEY) methamphetamine.

(2)  On or about May 20, 2009, at approximately 5:00 p.m., DEANNA WAGNER drove ALLAN STALEY to the parking lot of the

71

Food-For-Less store in Riverside to pick-up methamphetamine from JOHNNY GOMEZ.

(3) On or about May 22, 2009, using coded language during a telephone call, ROBERT CARRILLO discussed with ALLAN STALEY selling methamphetamine to him (STALEY).

(4) On or about May 22, 2009, at approximately 12:59 p.m., using coded language during a telephone conversation, CARRILLO discussed with ALLAN STALEY the sale of methamphetamine by CARRILLO to STALEY.

(5) On or about May 22, 2009, at approximately 2:05 p.m., using coded language during a telephone conversation, CARRILLO and STALEY discussed meeting in the Food-For-Less store parking lot to complete a drug transaction.

(6) On or about May 22, 2009, at approximately 3:00 p.m., DEANNA WAGNER drove ALLAN STALEY to the parking lot of the Food-For-Less store in Riverside to purchase methamphetamine from ROBERT CARRILLO.

(7) On or about May 22, 2009, at approximately 3:00 p.m., ALLAN STALEY purchased for sale from CARRILLO 27.0 grams of actual methamphetamine.

(8) On or about May 22, 2009, at approximately 3:47 p.m., after ALLAN STALEY was arrested by law enforcement officers, DEANNA WAGNER called CARRILLO and asked him if he would help out with ALLAN STALEY's bail. CARRILLO said he would.

72

(9)  On or about May 22, 2009, at approximately 3:57 p.m., using coded language during a telephone conversation, CARRILLO told MARK GIL that ALLAN STALEY was arrested after law enforcement found the methamphetamine in his car.

(10) On or about May 22, 2009, at approximately 3:59 p.m., using coded language during a telephone conversation, CARRILLO called NEVAREZ and told him that he (CARRILLO) was going to shut down the drug sales operation because STALEY was arrested and he (CARRILLO) feared that the police were on to him.  NEVAREZ replied that he did not think that he and CARRILLO should shut down the drug distribution business.

(11) On or about May 22, 2009, at approximately 3:59 p.m., using coded language during a telephone conversation, CARRILLO called NEVAREZ and told him that he (CARRILLO) was going to shut down the drug sales operation because STALEY was arrested and he (CARRILLO) feared that the police were on to him.  NEVAREZ replied that he did not think that he and CARRILLO should shut down the drug distribution business.

(12) On or about May 22, 2009, at approximately 4:21 p.m., during a telephone conversation, CARRILLO discussed with WAGNER and with another individual the arrest of STALEY.

**18. DEANNA WAGNER**

(1)  On or about May 20, 2009, at approximately 5:00 p.m., DEANNA WAGNER drove ALLAN STALEY to the parking lot of the

73

Food-For-Less store in Riverside to pick-up methamphetamine from JOHNNY GOMEZ.

(2)   On or about May 22, 2009, at approximately 3:00 p.m., DEANNA WAGNER drove ALLAN STALEY to the parking lot of the Food-For-Less store in Riverside to purchase methamphetamine from ROBERT CARRILLO.

(3)   On or about May 22, 2009, at approximately 3:47 p.m., after ALLAN STALEY was arrested by law enforcement officers, DEANNA WAGNER called CARRILLO and asked him if he would help out with ALLAN STALEY's bail.   CARRILLO said he would.

(4)   On or about May 22, 2009, at approximately 4:21 p.m., during a telephone conversation, CARRILLO discussed with WAGNER and with another individual the arrest of STALEY.

///

74

V.

**CONCLUSION**

37.  Based on the foregoing, I respectfully submit that there is probable cause to believe that SALVADOR OROZCO HERNANDEZ, JR., ROBERT ZAVALA CARRILLO, CHRISTOPHER NEVAREZ, RONNIE MARQUEZ, IGNACIO CHAVEZ, ANDREW PACHECO MORENO, DANIEL HENRY PADRON, MARK GIL, JOSE ARREDONDO, JOHNNY GOMEZ, VANESSA GARCIA, ALLEXXIS OLONNA SMITH, CHRIS JAMES GARCIA, RUDY TOVAR, NATENO MORENO, PAUL CORTEZ, ALLAN STALEY, and DEANNA WAGNER violated Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute more than 50 grams of actual methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)).


Jason T. Ghetian
Special Agent,
Federal Bureau of Investigation

Sworn to before me and subscribed
in my presence on this, 26 day of
January 2010.

DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE

75